**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **JOSE APONTE-DAVILA,** | |
| **Plaintiff,** | |
| **v.** | |
| **MUNICIPALITY OF CAGUAS, <u>et al.</u>,** | |
| **Defendant**. | |

**OPINION AND ORDER**

Delgado-Hernández, District Judge.

This is an action for damages arising out of a slip-and-fall incident in Caguas, Puerto Rico. Before the court are plaintiff's "Omnibus Motion *In Limine* to Exclude at Trial Defense Witnesses, Exhibits, and Other Matters" (Docket No. 266) and "Motion *in Limine* to Exclude Defendants' Economics Expert Jaime Del Valle Caballero" (Docket No. 267), both of which defendants opposed (Docket Nos. 276 and 277). Plaintiff replied (Docket Nos. 278 and 279), defendants sur-replied (Docket Nos. 286 and 287), and plaintiff sur-sur-replied (Docket Nos. 290 and 291).

The motions were filed between November 9, 2016 and January 27, 2017. Once the motion cycle closed, on February 2, 2017, the court scheduled a Motion/<u>Daubert</u> hearing for February 13, 2017, to discuss the motions and hear testimony on them (Docket No. 294). At the Municipality of Caguas' request, the hearing was vacated (Docket No. 304 at p. 4). The hearing was rescheduled for March 14, 2017 (<u>id.</u>); and held on that date (Docket No. 314). For the reasons explained below, the motion at Docket No. 266 is GRANTED IN PART AND DENIED IN PART, and the motion at Docket No. 267 is DENIED WITHOUT PREJUDICE to plaintiff's renewing it if appropriate,

following the Puerto Rico Supreme Court's response to a CERTIFICATION request to be made by the court in connection with one issue raised in the motion.

## I. DISCUSSION[1]

1. **Request to exclude the testimony of José Joaquín Rivera and Mónica Vega Conde**.
The request is DENIED.

Plaintiff contends these witnesses should be excluded because it was only on November 7, 2016, after the discovery cutoff date, that defendants untimely identified them in a "Rule 26 Disclosure" as individuals likely to have knowledge of discoverable information (Docket No. 266 at p. 3). Additionally, he states the proffered areas of the witnesses' testimony is inadmissible under Rules 601, 701 and 802 of the Federal Rules of Evidence. Id. at pp. 9-10.

### A. Timeliness.

Rule 26 of the Federal Rules of Civil Procedure requires a party, without awaiting a discovery request, to provide to the other parties the name of each individual likely to have discoverable information-along with the subjects of that information-that the disclosing party may use to support its claims or defenses. See, Fed.R.Civ. P.26(a)(1)(A)(i)(so requiring). That obligation is a continuing one. See, Fed.R.Civ. P.26(e)(1)(A)(imposing upon a party the obligation to supplement its disclosure promptly if the party learns that in some material respect the disclosure or response is incomplete or incorrect).

Rule 37 of the Federal Rules of Civil Procedure authorizes the trial court to impose sanctions, up to and including dismissal of the action on account of a party's failure to comply with these automatic disclosure obligations. See, Fed.R.Civ.P. 37 (authorizing sanctions, listing them, and

---

[1] Some of the disputes were ruled on during the hearing or resolved by way of stipulation shortly thereafter. To facilitate trial work, however, those rulings and stipulations will be expressly incorporated in this Opinion and Order.

setting forth corresponding enforcement procedure). Although sanctions can vary depending on the circumstances, the baseline rule is that the required sanction in the ordinary case is mandatory preclusion. See, Santiago-Díaz v. Laboratorio Clínico y de Referencia del Este, 456 F.3d 272, 276 (1st Cir. 2006)(stating rule). The mandatory preclusion can be mitigated in those cases where the failure to disclose was substantially justified or harmless. See, Fed.R.Civ. P. 37(c)(1)(so specifying). In the absence of harm to a party, a district court may not invoke the severe exclusionary penalty provided for by Rule 37(c)(1). See, Cruz-Vázquez v. Mennonite General Hosp., Inc., 613 F.3d 54, 58 n.1 (1st Cir. 2010)(acknowledging restriction).

Mr. Rivera is Director of the Municipality's Department of Public Works (Docket No. 266 at p. 7). Defendants explain that the failure to disclose Mr. Rivera as a possible witness earlier, was because the case was largely dormant for more than a year on account of an appeal to the First Circuit (Docket No. 276 at p. 4). After remand, counsel for the Municipality learned for the first time just a day or so prior to filing the Municipality's Pretrial Conference Report, that the previous Director was no longer with the Municipality and that Mr. Rivera is the current Director. Id. Defendants maintain Mr. Rivera's name was disclosed within 48 hours of the Municipality's counsel's learning that Mr. Rivera was the new Director. Id. at pp. 4-5. Additionally, they point out that in September 2013, when the Municipality did its initial disclosures, plaintiff was informed of the name of the then Director (Denisse Rosario); in October 2013 plaintiff expressed an interest in deposing Ms. Rosario; and in January 2014, he served a Rule 30(b)(6) notice of deposition on the Municipality, but in February 2014, he advised that he would not take any depositions of the Municipality in this case. Id. at pp. 5-6.

Ms. Vega is Executive Advisor to the Mayor of the Municipality, and the Municipality's Legal Director (Docket No. 266 at p. 7). Defendants posit that Ms. Vega was known to plaintiff, as

in August 2014 counsel for plaintiff in a related action in Puerto Rico made *ex parte* contacts in writing and by telephone with her (Docket No. 276 at p. 6). They assert that notwithstanding those contacts, plaintiff never attempted to depose Ms. Vega or any other employee or representative of the Municipality. Id. at p. 7. They state that if plaintiff had gone forward with the Municipality's 30(b)(6) deposition, plaintiff would likely have had a chance to depose Ms. Vega at that time because although the final designation of municipal representatives for the deposition had not been made before plaintiff cancelled the deposition, Ms. Vega was the person which the Municipality would most likely have designated to cover item (g) of the Notice of Deposition during the deposition. Id. at pp. 7-8.[2]

As to both Mr. Rivera and Ms. Vega, defendants claim that preclusion should not be applied here. Id. at p. 11. They reason that considering the procedural context of the litigation, the fact that the Pretrial Conference has not taken place and trial has not been scheduled, allowing the plaintiff to depose these witnesses would be sufficient to cure any arguable prejudice to him based on the timing of the supplementation. Id. at p. 11. They assert that in the end, under Rule 37(c)(1)(A) the court may order payment of reasonable attorney's fees and expenses instead of ordering the exclusion of trial testimony. Id. at p. 12.

The court will not exclude the witnesses because of late disclosure. Nevertheless, the ruling is conditioned upon the Municipality's depositing in the Clerk's Office not later than July 31, 2017, the amount of $5,000.00 to cover (i) plaintiff's reasonable attorneys' fees in connection with the depositions (to include record counsel preparation time); and (ii) expedited deposition-transcript

---

[2] The argument that plaintiff's decision to forego deposing the Municipality as allowed by Rule 30(b)(6) somehow excuses the lateness is not persuasive. Formally disclosing the name of persons with knowledge of facts supporting a claim or defense provides the parties with a meaningful opportunity to decide whether to take a deposition or not. At the end of the day, defendants had the obligation to disclose irrespective of whether plaintiff had earlier expressed that he would not depose any of the originally disclosed witnesses.

expenses. In the event the Municipality prevailed in the action, it shall not tax the transcript expenses

as costs. The depositions must be taken at a mutually agreed on place and time, not later than August

31, 2017. If the depositions are taken, the deponents will have ten calendar days to review the

transcript. These measures reflect the court's evaluation of the circumstances underlying the late

disclosures; the grounds asserted to explain the lateness; the stage of the proceedings at which the

disclosures were made; and the degree to which the court expects the measures to remedy the harm

that otherwise may be inflicted by the Municipality's untimely disclosures.[3]

### B. Content of Testimony

Beyond late disclosure, plaintiff asks that the witnesses be excluded on account of what may

be referred to as informational deficits linked to the content of their proffered testimony (Docket No.

266 at pp. 9-10). He argues that the accident in this case occurred on July 13, 2009, and as such, the

witnesses cannot provide evidence about events that took place several years ago because they (i)

were appointed to their current positions thereafter and lack the personal knowledge required by

Rule 602 of the Federal Rules of Evidence; (ii) are impeded to offer lay opinions not based on their

---

[3] Plaintiff asserts that reopening discovery for this limited purpose "add[s] insult to injury" (Docket No. 291 at p. 6) because the case had been set for trial for May 26, 2014 when it was reassigned to the undersigned. <u>Id</u>. He misses the mark. On May 9, 2013, he initiated the action (Docket No. 1). On May 10, 2013, the case was assigned to the original presiding judge (Docket No. 2). On June 19, 2013, the presiding judge set the pretrial/settlement conference for May 19, 2014, and trial for May 26, 2014 (Docket No. 14). In the meantime, motions for entry of default, for miscellaneous relief and to strike were filed (Docket Nos. 11, 18, and 26); and orders were entered (Docket Nos. 13, 28 and 41). On September 13, 2013, the Magistrate Judge set May 10, 2014 as deadline to file motions for summary judgment and other dispositive motions, and June 9, 2014 (beyond the scheduled trial date) as the deadline to file answers to motions for summary judgment and other dispositive motions (Docket No. 42). On March 20, 2014, Consolidated Waste Service and Mapfre/Praico filed a motion for extension of time until 60 days to conclude discovery (Docket No. 66), which plaintiff opposed on March 21, 2014 (Docket No. 68), following up with an emergency motion for protective order (Docket No. 69). On March 26, 2014, the case was reassigned to the undersigned (Docket No. 70), and Consolidated filed a motion to dismiss/lack of prosecution in connection with plaintiff's motion for protective order (Docket No. 71), which the Municipality joined (Docket No. 73), and plaintiff opposed (Docket No. 74). On April 14, 2014, the court vacated the pretrial and trial; ruled on pending motions; and ordered the parties to file a joint progress report regarding discovery every 15 days beginning on April 30, 2014 until June 16, 2014 (Docket No. 76). Other discovery disputes followed. <u>See</u>, Docket Nos. 79, 81, 101, 106, 107, 112, 120, 121, 126, 146, 153, 156, 157, 161, 167, 168, 169, 181, 184, 188, 206 and 210, one of which involved the Municipality's request to exclude plaintiff's expert witness for failure to comply with discovery obligations (Docket No. 153). Court rulings were entered at Docket Nos. 97, 98, 100, 117, 118, 129, 130, 152, 158, 159, 163, 170, 180, 187, 189, 219 and 220. It is apparent the case was not ready for trial when the court vacated the original trial date.

own perception within the scope of Rule 701 of the Federal Rules of Evidence; and (iii) may not testify about what some other employee may have told them because it would be inadmissible hearsay under Rule 802 of the Federal Rules of Evidence (Docket No. 266 at pp. 9-10).

As relevant, Fed.R.Evid. 602 provides that a witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Fed.R.Evid. 701 states in part that if a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is rationally based on the witness's perception. In general, Fed.R.Evid. 802 excludes hearsay unless a federal statute, the rules of evidence or other rules prescribed by the Supreme Court provide otherwise. From an abstract vantage, plaintiff's reliance on these rules supports the general propositions for which he has cited the rules. On a more practical level, however, the exclusion argument may not succeed.

Organizations such as the Municipality testify through individuals with personal and/or organizational knowledge of facts relevant to the claim or defense. See, Anderson v. Credit Bureau, Inc., 422 Fed.Appx. 534, 538 (7th Cir. 2011)(contrasting personal and organizational knowledge in context of dispute regarding entity's business records); Harris v. Koening, 271 F.R.D. 356, 368 (D.D.C. 2010)(noting that 30(b)(6) deponent may testify regarding organizational and personal knowledge). Such perspective informs testimony of municipal employees or officials under Fed.R.Evid. 602, and for the same reason, does not preclude their testimony under Fed.R.Evid. 701.

Personal knowledge includes inferences and opinions, as long as they are grounded in personal observations and experience. See, United States v. Rodríguez, 162 F.3d 135, 144 (1st Cir. 1998)(stating principle). The rules coalesce around Fed.R.Evid. 803(8)(A), which makes admissible as an exception, three categories of public records, namely: (i) records of an office's activities; (ii) records of a matter observed while under a legal duty to report; and (iii) factual findings from a

legally authorized investigation.[4]  In turn, the records are admissible as a hearsay exception provided the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.  Fed.R.Evid. 803(B).  From this perspective, the personal knowledge requirement does not extend to official reports under Fed.R.Evid. 803(8).  See, Alexander v. CareSource, 576 F.3d 551, 562 (6th Cir. 2009)(so recognizing); Remington Inv., Inc. v. Quintero & Martínez Co., Inc., 961 F.Supp. 344, 351-352 (D.P.R. 1997)(rejecting contention that Rule 803(8) requires official preparing report to have firsthand or personal knowledge of matters contained therein).

In this line, Fed.R.Evid. 803(8) renders presumptively admissible not merely factual determinations in the narrow sense but also conclusions and opinions based upon a factual determination.  See, Lubanski v. Coleco Industries, Inc., 929 F.2d 42, 45 (1st Cir. 1991)(discussing issue).  Considering the interplay of these elements, a more focused context is needed to determine whether the testimony of Mr. Rivera and Ms. Mena should be excluded on the grounds that plaintiff has set forth.  So any ruling involving admissibility of specific portions of the testimony will be dealt with during trial.

2.  **Request to exclude photographs of place of incident; ConWaste's Contract with Eddie Jiménez Cosme; Department of Transportation and Public Works Regulation; Use Permits for the Cafeteria run by Eddie Jiménez Cosme; plaintiff's driver's licenses; documents related to plaintiff's disability parking permit; Curriculum Vitae ("CV") of defendants' expert witnesses, and  of their expert reports (Docket No. 266 at pp. 11-14).**
The request is GRANTED IN PART AND DENIED IN PART.[5]

Plaintiff claims that (i) defendants have not shown him the photographs; (ii) he has not received a legible copy of the ConWaste contract; (iii) use permits are irrelevant considering that the

---

[4] The term "factual finding" includes not only what happened, but how it happened, why it happened, and who caused it to happen. See, M. Graham, *Federal Practice and Procedure: Evidence* § 7049 at p. 649 (Interim ed. 2006) and cases cited therein (addressing topic).

[5] Plaintiff also seeks to exclude documents evidencing his residence at relevant time periods and/or where he claimed to be a resident of. Puerto Rico (Docket No. 266 at p. 13).  The issue will be addressed in Section I (6)(B)(vi).

accident in this case has nothing to do with the physical premises of the cafeteria; (iv) documents relating to residence are irrelevant because the First Circuit settled the jurisdictional challenge; (v) the CVs and expert reports are irrelevant and consist of inadmissible hearsay; and (vi) the Regulation is irrelevant because this case does not involve motor vehicles.  Id.  As to the use permits, residence documents, driver's licenses, disability parking permit, CV's and expert reports, plaintiff claims that whatever their probative value,  it is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time or needlessly presenting cumulative evidence and for that reason, should be excluded under Fed. R. Evid. 403.  Id.

At Docket No. 309, the parties informed that after the Motion/Daubert hearing, the Municipality delivered to all parties actual trial photographs.  Id. at p. 2.  Given that plaintiff now is aware of which trial photographs defendant will use, he has not objection to them.  Along the same line, the attorney for Eddie Jiménez sent to plaintiff copy of the original of the Contract between Jiménez and ConWaste.  Id.  As it is a PDF document, plaintiff may enlarge it in its computer and read it without any problem.  On that basis, plaintiff has withdrawn objections to the Contract.  Id.

Finally, during the Motion/Daubert hearing defendants announced they would not be presenting the Department of Transportation and Public Works Regulation (Docket No. 314 at p. 2).  And the same day, the court ruled that the CV's and expert reports will not be presented to the jury (id.) but may be used by the experts as they testify during the trial.  Id.  See, Mahnke v. Washington Metropolitan Area Transit Authority, 821 Fed.Supp.2d 125, 154 (D.D.C. 2011)(holding that technically, reports prepared by experts and CV's of expert witnesses are hearsay and are not admissible into evidence pursuant to Fed.R.Evid. 802); Sheffield v. State Farm Fire and Casualty Company, 2016 WL 3548550, *8 (S.D.Ga. June 23, 2016)(noting in context of CV's, that party

cannot introduce document at trial and must elicit any pertinent information contained in the document by way of direct testimony).

**3. Request to exclude from trial any reference to difference in damages amount between state and federal complaints (Docket No. 266 at pp. 14-16)**. The request is GRANTED.

In 2010, plaintiff initiated an action in the Puerto Rico Court of First Instance seeking $380,000.00 in damages out of the same incident for which he sued here (Docket No. 276 at pp. 17-18). He withdrew that case without prejudice, and brought the present claim asking for $14.5 Million in damages. Id. at p. 18. Defendants assert the jury is entitled to know of the inconsistency. Id. at pp. 17-19. Plaintiff points out that the amount of damages claimed in a complaint (*ad damnum*) is an opinion of counsel, not a ceiling on recovery, as such lacks relevance and should not be referred to during trial (Docket No. 266 at pp. 15-16). Defendants state the issue bears on credibility (Docket No. 276 at p. 18).

During the Motion/Daubert hearing, the court sustained plaintiff's request to exclude the *ad damnum* (Docket No. 310). As the First Circuit recognized in Davis v. Browning-Ferris Industries, Inc., 898 F.2d 836, 837-838 (1st Cir. 1990), the *ad damnum* is, blatantly, an opinion of counsel. By extension, it does not strictly bound plaintiff. See, Aggarwal v. Ponce School of Medicine, 745 F.2d 723, 729 (1st Cir. 1984)(explaining that plaintiffs are not strictly bound by a prayer for relief in a complaint); Davis, 898 F.2d at 838 (error to inform the jury it could consider *ad damnum*). In consequence, it will not be raised before the jury.

**4. Request to exclude from trial any reference to "contributory negligence" (Docket No. 266 at p. 16).** The request is GRANTED.

Defendants argue contributory negligence (Docket No. 252 at p. 13). Plaintiff points out that Puerto Rico law recognizes comparative negligence, not contributory negligence; and for the same reason, that reference to contributory negligence would be irrelevant, confusing and unduly

prejudicial (Docket No. 266 at p. 16). Defendants state that diversity cases in this district refer to

principles of contributory negligence under Puerto Rico tort law (Docket No. 276 at p. 19). But

Puerto Rico is a comparative negligence jurisdiction. See, Ruiz-Troche v. Pepsi Cola of Puerto

Rico Bottling Co., 161 F.3d 77, 87 (1st Cir. 1998)(so noting). It has been so since 1956, when it

adopted the comparative negligence standard to replace the common-law doctrine of contributory

negligence. See, Candelario Del Moral v. UBS Financial Services Incorporated of Puerto Rico,

2016 WL 1275038, *25 (D.P.R. March 31, 2016)(delineating standard's adoption in Puerto Rico)

(citing Carlos J. Irizarry Yunque, _Responsabilidad Civil Extracontractual_ 253 (6th ed. 2007)).

Therefore, reference to contributory negligence would be inappropriate at trial.

Nonetheless, the parties may refer to, and probe for comparative negligence; and to the

extent the evidence allows it, argue to the jury that any compensation plaintiff is entitled to, should

be adjusted for comparative negligence. See, Candelario, 2016 WL 1275038 at *25 (explaining

that under comparative negligence, if a plaintiff's own conduct is one of the adequate causes of

the harm, then the award must be reduced in proportion to the percentage of the harm plaintiff

caused).

**5.** **Request to exclude from trial any reference to jurisdiction being contested (Docket No. 266 at p. 17)**. The request is GRANTED.

Plaintiff asserts he is a domiciliary of Texas, but defendants state he is not and contest

jurisdiction (Docket No. 221 at p. 1). Plaintiff posits the First Circuit ruled there is subject matter

jurisdiction, and that when an appellate court decides upon a rule of law, that decision governs the

same issues in subsequent stages in the same case (Docket No. 266 at p. 13; Docket No. 279 at pp.

7-9). Earlier in the litigation, this court concluded that when plaintiff initiated the present action

he was a citizen of Puerto Rico rather than of Texas. See, Aponte-Dávila v. Municipality of

Caguas, 2015 WL 3889963, *1, *4-*6 (D.P.R. June 23, 2015)(Docket No. 221). The First Circuit reversed, concluding that plaintiff "did not abandon his Texas domicile in favor of a Puerto Rico domicile after his accident in 2009, and that Texas necessarily remained his domicile until at least the date that [t]his lawsuit was filed." See, Aponte-Dávila v. Municipality of Caguas, 828 F.3d 40, 52 (1st Cir. 2016)(Docket No. 226).

Defendants claim the First Circuit did not rule on whether a jury is required to decide contested issues of fact regarding plaintiff's intent to make Puerto Rico his domicile; that plaintiff has made conflicting statements under oath about residence; and to this extent, that residence is beyond the scope of the First Circuit's mandate (Docket No. 276 at pp. 20-21). But the First Circuit did rule on jurisdiction. Thus, unless defendants come up with facts other than those the First Circuit evaluated – and they have not done so – jurisdiction is not to be contested at trial.

**6. Request to exclude testimony of defendants expert, Dr. Jaime del Valle Caballero (Docket No. 267 at pp. 3-2)**. The request is DENIED.

Plaintiff seeks the exclusion of Dr. Del Valle on two grounds: (i) violation of discovery obligations under Rules 26 and 37 of the Federal Rules of Civil Procedure; and (ii) Rule 702 of the Federal Rules of Evidence (Docket No. 267 at pp. 1-2). As to Rules 26 and 37, he complains of late disclosure. Id. at pp. 3-5. With regard to Rule 702, he attacks the expert's opinion as speculative and unreliable. Id. at pp. 7-19.

### A. Fed.R.Civ. P. 26 and 37

Plaintiff asserts defendants engaged Dr. Del Valle in February 2014. Id. at p. 3. He states that even though they were required to automatically disclose in a timely manner under Rule 26 a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition as well as a statement of the compensation to be paid for the study and testimony in

the present case, they did neither.  Id.  Accordingly, he argues that the testimony should be excluded under Rule 37.  Id. at p. 5.

Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure requires a party to disclose to other parties the identity of any person who may be used at trial to present expert evidence.  See, Fed.R.Civ.P. 26(1)(2)(A)( mandating disclosure).  The disclosure must be accompanied by a written report containing: (i) a complete statement of all opinions to be expressed and the basis and reasons therefor; (ii) the data or other information considered by the witness in forming the opinions: (iii) any exhibits to be used as a summary of or support for the opinions: (iv) the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; (v) and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.  See, Fed.R.Civ.P. 26(a)(2)(B)(laying out expert witness disclosure requirements).

These directives are mandatory and self-executing.  See, Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 59-60 (1st Cir. 2001)(so noting).  As pointed out earlier in connection with initial disclosure violations, however, the baseline sanction is mandatory exclusion unless the failure to disclose was substantially justified or harmless.  Id. at 60.  To that end, defendants assert that (i) on October 16, 2013, they notified plaintiff the cases where Dr. Del Valle had testified or had been deposed during the past 17 years; (ii) these appear in the right hand column of the "Forensic Experience" section of the CV; (iii) the disclosures went beyond what was required; (iv) in November 2016, the information was updated with the list of cases through 2016 including a statement of fees or compensation which were to be paid to Dr. Del Valle for his study and testimony in this case; and (v) plaintiff informed defendants during the discovery period that he did not intend to depose Dr. Del Valle (Docket No. 277 at pp. 3-6).

On this record, exclusion is not warranted. In fact, earlier in the litigation the Municipality requested the exclusion of plaintiff's expert witness in part due to plaintiff's failure to provide expert-related information. <u>See</u>, "Motion in Limine to Exclude the Expert Testimony of Francisco Martínez, or in the Alternative, to Compel Plaintiff's Expert Witness Francisco Martínez to Comply with Discovery Requests Made During his Deposition Within One Week or that He Be Excluded as an Expert Witness, and Renewing Motion to Extend the Discovery and other Case-Management Deadlines so Plaintiff Does Not Profit from his Neglect of his Discovery Obligations and Requesting an Urgent Conference Regarding Discovery" (Docket No. 153). The court denied the request to exclude the testimony, ordering the expert to produce all missing information other than material protected by Fed.R.Civ.P. 26(b)(4). <u>See</u>, Docket No. 170 at pp. 4-7. A similar solution is apt at this juncture. <u>See</u>, <u>Macaulay</u> v. <u>Anas</u>, 321 F.3d 45, 51 (1st Cir. 2003)(in evaluating whether to preclude testimony, court may consider history of the litigation).

**B. Fed. R. Evid. 702.**

Plaintiff attacks Dr. Del Valle's testimony as speculative and unreliable under Rule 702 of the Federal Rules of Evidence (Docket No. 267 at pp. 7-19). Rule 702 makes admissible expert testimony that will assist the trier of fact to understand the evidence or to determine a fact in issue. <u>See</u>, <u>Chadwick</u> v. <u>Wellpoint, Inc.</u>, 561 F.3d 38, 48 (1st Cir. 2009)(so observing). It mandates that a putative expert be qualified to testify by knowledge, skill, experience, training or education. <u>See</u>, <u>Levin</u> v. <u>Dalva Brothers, Inc.</u>, 459 F.3d 68, 78 (1st Cir. 2006)(stating requirement). Pursuant to <u>Daubert</u> v. <u>Merrell Dow Pharm. Inc.</u>, 509 U.S. 579 (1993), district courts must evaluate an expert's proposed testimony for relevance and reliability prior to admitting it. <u>Id.</u> at 589-595. The opinion of a qualified expert witness is admissible if (i) it is based on sufficient facts or data; (ii) it is the product of reliable principles and methods; and (iii) the expert has reliably applied the principles and

methods to the facts of the case. See, American Home Assurance Company v. Greater Omaha Packing Co., Inc., 819 F.3d 417, 425 (8th Cir. 2016)(identifying parameters of admissibility). Nonetheless, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Daubert, 509 U.S. at 500.

### 1. Plaintiff's Challenge

Plaintiff alleges to have suffered damages as a result of defendants' negligence when he fell while walking on a public sidewalk in Caguas, Puerto Rico, when he went by a dumpster that was obstructing the sidewalk, which was highly slippery and dangerous due to accumulated grease that seeped from the dumpster (Docket No. 1 at p. 4).[6] He seeks compensation for, among other things, lost earnings (Docket No. 1 at p. 4), an item recognized in Puerto Rico.[7] He retained an expert witness to support his claim, and in turn, defendants retained Dr. Del Valle to counter the opinion of plaintiff's expert.

Plaintiff characterizes Dr. Del Valle's report as self-disqualifying (Docket No. 267 at p. 6), complaining that he used a flawed method to compute the value of lost earnings, producing unreliable results. Id. at p. 11. Dr. Del Valle utilized a Life-Participation and Employment ("LPE") methodology. See, Dr. Del Valle's Report (Docket No. 267-2) at p. 3.[8] And so, the challenge to the methodology calls for insights into the modeling used here, to evaluate the propriety of applying it to the circumstances of the case within the parameters set by relevant caselaw.

---

[6] As such, the action is subject to Puerto Rico law. See, De Jesús Adorno v. Browning Ferris, 160 F.3d 839, 840, 842 (1st Cir. 1998)(applying Puerto Rico law to action for injuries sustained by plaintiff while attempting to deposit bag into a trash container located in Puerto Rico).

[7] See, Herminio M. Brau, *Los Daños y Perjuicios Extracontractuales en Puerto Rico* 474-516 (1986)(discussing concept under Puerto Rico law).

[8] Plaintiff's expert used a different methodology.

2. Lost Earnings

The lost earnings component of damages is commonly referred to in Spanish as "lucro cesante." See, Ronald Martínez-Cuevas, "Assessing Economic Damages in Personal Injury and Wrongful Death Litigation: the Commonwealth of Puerto Rico," 16(3) _Journal of Forensic Economics_ (2003), 329 at p. 331 (so noting). It measures the earnings that the plaintiff could have been expected to receive. Id. To that end, it basically consists of two elements: past loss ("lucro cesante pretérito") and estimated future loss ("lucro cesante futuro"). See, Rodríguez-Báez v. Nationwide, 156 D.P.R. 614, 619 (2002)(recognizing both elements); Rodriguez v. Ponce Cement Corp., 98 D.P.R. 201, 217-218 (1969)(same). The estimated future loss has been described as a frustrated future gain that with certain probability would be expected according to the normal course of events. See, Velázquez v. Ponce Asphalt, 113 D.P.R. 39, 48 (1982)(describing term). Recovery is allowed for both types of loss, inasmuch as they represent losses sustained during different periods of time, and as such, do not amount to double recovery.

3. Evaluative Elements

To evaluate lost earnings, the Puerto Rico Supreme Court has generally considered the claimant's income previous to the alleged damage; an estimation of work-life expectancy based on, among other elements, age, sex, origin, occupation, health, habits, idiosyncrasies and other intangibles; and adjustment to present value. See, Suro v. E.L.A., 111 D.P.R. 456, 461, 466 (1981)(identifying elements). The resulting calculations may serve as baseline, as one of the factors the fact finder may consider in conjunction with other elements to determine lost earnings. See, Viuda de Delgado v. Boston Ins. Co., 99 D.P.R. 714, 728-729 (1971)(so explaining); Escobar-Galarza v. Banuchi-Pons, 114 D.P.R. 138, 152-153 (1983)(Rebollo, J., Concurring Opinion)(noting principle).

### 4. Dr. Del Valle's Methodology

Plaintiff has been described as an independent trucker (Docket No. 167-6 at p. 3). So Dr. Del Valle took into account plaintiff's net earnings; the intertemporal probability of survival for men in Puerto Rico; the probability of being employed; and the probability of participating in the labor force for males of the relevant age group in Puerto Rico, relying on data published by the Puerto Rico Health and Labor and Human Resources Departments. See, Dr. Del Valle's Report, Docket No. 267-1 at pp. 5, 12-14.[9] He did not apply interest to past loss, and adjusted estimated future loss to present value. Id. at pp. 3-4, 14-15.

At first glance, the calculations seem to reflect the analysis that the Puerto Rico Supreme Court has used to evaluate lost earnings, considering net earnings based on the tax returns that plaintiff produced; determining expected work-life; and adjusting projected probable earnings to present value. See, e.g., Suro, 111 D.P.R. at 456, 461, 466 (lost earnings calculations); Nationwide, 156 D.P.R. at 628-629 (utilizing net rather than gross earnings to calculate economic loss in case of individual – an insurance agent – with no fixed earnings); Antonio J. Amadeo-Murga, *El Valor de los Daños en la Responsabilidad Civil* 136 (2012 ed.)(pointing out need to deduct from gross earnings the expenses necessary to generate them in order to calculate the lost earnings of self-employed individual); Brau, supra at pp. 514-516 (discussing various lost earnings scenarios).

### 5. Plaintiff's Arguments

Plaintiff claims Dr. Del Valle's report is unreliable because it (i) is vague on the subject of alternate professionals and scenarios; (ii) erroneously projects earnings based on a faulty construction of income stream; (iii) does not include interest; (iv) fails to account for relevant factors;

---

[9] Dr. Del Valle adjusted plaintiff's probability of being employed to 1 (100 %) because plaintiff was self-employed (Docket No. 267-2 at p. 15).

(v) does not explain assumptions; and (vi) mistakenly relies on Puerto Rico data or cohort[10] to estimate work-life expectancy, probability of survival and probability of participating in the labor force, notwithstanding the fact that when the accident occurred, plaintiff was domiciled and working in Texas, not Puerto Rico (Docket No. 267 at pp. 6-8, 14-15; Docket No. 290 at pp. 5-6). The vagueness, income-stream, interest, variable use and failure-to-explain arguments do not raise particular difficulty. But the attack on the Puerto Rico cohort brings forth an issue for which the court has found no controlling authority and hence certifies to the Puerto Rico Supreme Court.

6. <u>Analysis of Arguments</u>

(i)    Vagueness

Dr. Del Valle's report estimates at $155,856.00, plaintiff's probable loss of earnings through age 67.95 (Docket No. 267-2 at p. 14). The report explains that the partiality of the interruption in earnings can be adjusted by multiplying the compensable loss by the percentage of the interruption, or mitigation. <u>Id.</u> at p. 15. It points out that the duration of the interruption can be adjusted by truncating the compensation at the year it is found reasonable that plaintiff could be able to return to the labor market. <u>Id.</u> at p. 16. And in that sense, states that if it were considered reasonable that plaintiff could be able to return to work in 10 years from the date of the accident while assuming complete disability throughout the period, cumulative compensation could end at year 2018 (2009 to 2018 inclusive) with a $73, 812.00 in total compensable loss. <u>Id.</u> Nonetheless, it adds that "many other contingent scenarios for degree of occupational disability and of its duration can be constructed," and that "calculation of the according compensation can be made," but that "this is a

_____

[10] In general, the term "cohort" refers to a group comprised by individuals sharing specified characteristics. It has been defined as "an aggregate of individual elements, each of which experienced a significant event in its life history during the same chronological interval," <u>International Encyclopedia of the Social Sciences</u> (1968); "a group of persons with a common statistical characteristic," <u>The Oxford Encyclopedic English Dictionary</u> (1991); and "a subgroup sharing a common factor in a statistical survey, as age or income level," <u>Webster's New World Dictionary of American English, Third College Ed.</u> (1988).

matter of expert testimony **from other professionals** and a legal determination of relevant evidence submitted throughout the proceedings" (emphasis added).  <u>Id.</u>

Plaintiff argues that Dr. Del Valle's report is self-disqualifying because it does not state what kind of other professionals are needed nor how his opinion is affected by the other equally valid scenarios that he refers to (Docket No. 267 at pp. 6-7).  He claims that the conclusion leaves no doubt that the opinion, far from assisting the jury, cannot be helpful to the jury in resolving any fact in issue and is unreliable because it can only lead to jury confusion, conjecture, and speculation about which part, if any, of his calculations is materially relevant to this case considering the other scenarios.  <u>Id.</u> at p. 7.  Properly examined, however, the phrase at issue means no more that, if certain assumptions related to the degree of disability or the period of disability change, the overall results would need to change to reflect the changes in the assumptions that the conclusions are based on.  So considered, the qualifier is commonsensical rather than a breeder of confusion, conjecture or speculation.

(ii)    *Stream of Earnings*

Plaintiff maintains that Dr. Del Valle erroneously projects annual earnings from a five-year period beginning in 2008 and ending in 2012, even though the only year in which plaintiff worked normally without interruption was 2008 because in the middle of 2009 he was  hurt and there were several months when he could not work.  <u>See</u>, Transcript of Motion/<u>Daubert</u> hearing, February 14, 2016 ("Transcript") at pp. 165-167.  Dr. Del Valle used the numbers that plaintiff's expert witness used.  If so, reliance on those numbers does not make his opinion unreliable under <u>Daubert</u>.

(iii)    *Interest*

Dr. Del Valle did not add interest to past loss.  In his report, he states that "addition of interest to past losses, although mathematically correct, is contrary to local jurisprudence (<u>Sro. Vida. de García</u> v. <u>ELA</u>, 111 D.P.R. 456 (1981)) and it is usually applied only in cases where the case has

been litigated with "rashness, "boldness" or what in Spanish is called "temeridad" (2009 Rules of Civil Procedure, Rule 44.3(b)). Therefore, past losses should be computed at their nominal value, without including interest payment" (Docket No. 267-2 at pp. 3-4).[11] Plaintiff challenge the report, stating that Dr. Del Valle confused interest that is assessed for obstinacy, with the interest that reflects the present value of money (Docket No. 267 at p. 13). As such, he contends that Dr. Del Valle's methodology is fatally flawed because by not using interest, he artificially and substantially underestimated future loss of earning. Id.

The Puerto Rico Supreme Court has not required that interest be added to past loss. See, e.g., Ponce Asphalt, 113 D.P.R. at 44 (awarding past loss without interest; Ponce Cement, 98 D.P.R.at 218-219 (same). And it applies a discount rate of 6 % on future projected earnings for present value. See, e.g., Suro, 111 D.P.R. at 467 (applying 6 % rate). As an author has pointed out, in most of the decisions, the Puerto Rico Supreme Court adds losses before trial without adding or subtracting interest, and discounts only losses estimated for the period after the trial. See, Martínez-Cuevas, supra at 337 (so noting).

On this issue, Demetrio Fernández and Carlos Toro, "El Lucro Cesante en Materia de Responsabilidad Civil Extracontractual: la Confusion de la Torre de Babel," 52 Rev.Jur.U.P.R. 31 (1983), advocate for application of interest to past loss. Id. at pp. 90-91. Herminio M. Brau, however, calculated past loss without applying discount or interest. See, Brau, supra at pp. 99, 505, 512, 515-516 (so doing based on reading of Puerto Rico Supreme Court caselaw). With that in mind, irrespective of the role of interest under the Puerto Rico Rules of Civil Procedure, interest is not to

---

[11] Another English language term for "temeridad" is "obstinacy." See, Candelario, 2016 WL 1275038 at *30 (applying English term to determination of whether prejudgment interest and attorney's fees should be imposed under Rules 44.1(d) and 44.3(b) of the Puerto Rico Rules of Civil Procedure).

be applied to past loss calculations. See, Nationwide Insurance, 156 D.P.R. at 619-620 & n.9 (no interest); Ponce Asphalt, 113 D.P.R. at 44 (same); Ponce Cement, 98 D.P.R. at 218-219 (same).

(iv) *LPE's Purported Failure to Account for Relevant Factors*

Relying on H. Richards and M. Donaldson et al, *Life and Worklife Expectancies*, Lawyers & Judges Publishing Company, Inc. (1999, 2010 ed.), plaintiff contends that Dr. Del Valle's LPE methodology improperly addresses expectancy rather than capacity; reduces earnings for all periods of unemployment when voluntary unemployment is a choice of allocation of time instead of a diminishment in capacity to work; fails to distinguish properly between a person who is currently active or inactive and treats all workers as having equal probabilities of working in any subsequent year, which may not be of major importance for younger workers who have relatively high mobility between active inactive periods but becomes critical for older people (such as him), in a way that underestimates the actual participation for initially active older males; and underestimates losses which begin at the middle ages or later because it does not incorporate expectancy and participation probabilities based on the person's actual past patterns, but rather on statistical averages. See, Docket No. 267 at pp. 15-16.[12]

There are various methods to estimate the duration of working life in addition to the LPE method that Dr. Del Valle used. See, H. Richards and M. Donaldson, supra at 105-118 (examining methods). All the same, no "single method of determining the duration of working life is appropriate for all situations," and "no model is without problems." Id. at 116.[13] As for the LPE method, it can incorporate up-to-date information, it provides for theoretically appropriate discounting, and it is

---

[12] The assessment appears in H. Richards and M. Donaldson, supra at 114.

[13] A description and discussion of the strengths, weaknesses, advantages and disadvantages of the more common methods of determining the duration of working life is found in H. Richards and M. Donaldson, supra at 105-113, 116-118 (2010 ed.).

much easier to implement than other methods.  Id. at 118.  Similarly, it spreads expected earnings proportionally over many years rather than concentrating them in the earliest periods.  Id. at 113.  It may not take into consideration preinjury activity patterns, and if so, may underestimate losses for active people whose onset of loss is at older ages.  Id. at 118.  But so called work-life methods front-load loss estimates by having all losses occur during an uninterrupted period immediately subsequent to the onset of loss, and usually result in overestimates of loss.  Id. at 116.[14]

As for the capacity versus expectancy dichotomy, theoretically, at the extreme, capacity would extend throughout life expectancy, diminished only by average work-limiting disability and other involuntary absences from the labor force, but in practice, it is usually taken as the number of uninterrupted years remaining from the age of injury or death until retirement or another point in the future.  Id. at p. 97.  Likewise, even when capacity is the legal standard, expectancy estimators are often used.  Id. at p. 98.  And the most common measure of expectancy used by about half of forensic economists is the number of expected years of remaining work-life.  Id. at p. 98.  Even still, that is grind for the jury.  The fact that there is a difference of opinion between plaintiff's and defendant's experts as to which methodology is superior to another does not make Dr. Del Valle's opinion unreliable under Daubert.  See, Advisory Committee Notes on 2000 Amendment to Fed.R.Evid. 702 (stating that amendment to incorporate Daubert was not intended to prohibit testimony on competing methodologies within a field of expertise).

(v) *Expert Report's Lack of Explanation*

Plaintiff complains that Dr. Del Valle's report does not contain the full explanation for using the Puerto Rico cohort, and for the same reason, argues the report is not reliable (Transcript at p.

---

[14] On the issue of overestimation, based on Dr. Del Valle's analysis defendants contend that plaintiff's expert's calculations are grossly inflated (Transcript at p. 182).

185). After hearing Dr. Del Valle's testimony in the Motion/<u>Daubert</u> hearing, exclusion is not called for. Dr. Del Valle explained to the court's satisfaction how his experience led to the conclusion that a Puerto Rico cohort is appropriate to evaluate plaintiff's claim. He has been consistently using the same methodology since 2000 (Transcript at p. 29). The methodology has never been rejected or found unreliable. <u>Id.</u> at pp. 32-33. He utilized the same methodology in a report he prepared for one of plaintiff's attorneys in another case before this court. <u>See</u>, Defendants' Exhibit D, Motion/<u>Daubert</u> hearing (Transcript at pp. 53-56). Contrary to plaintiff's contention, the report cannot be rejected simply because it does not cite to sources of supporting authority. <u>See</u>, <u>Delgado</u> v. <u>Dorado Health, Inc.</u>, Report and Recommendation, 2016 WL 4742257, *2-*4 (D.P.R. September 2, 2016) and cases cited therein; 2016 WL 4 742259, *1 (D.P.R. September 12, 2016) adopting Report and Recommendation (denying motion to exclude expert's report and testimony under <u>Daubert</u> even though expert did not include citations to treatises, textbooks or articles in support of opinion).

(vi)    *Cohort*

Plaintiff alleges that Dr. Del Valle erred in including him in the Puerto Rico cohort to rely on Puerto Rico survival and labor participation rates to estimate expected work-life and project future lost income (Transcript at p. 167). He asserts he was a domiciliary of Texas, earning income in Texas as a long-haul trucker, an occupation that does not exist in Puerto Rico. <u>Id.</u> at pp. 170-171. And he maintains that there is no authority for using the Puerto Rico cohort to measure loss of Texas income for a Texas domiciliary who does not work in Puerto Rico. <u>Id.</u> at p. 185.[15]

---

[15] That plaintiff's occupation – long haul trucker – does not exist in Puerto Rico or generated income in a stateside economy with higher wage rates than Puerto Rico does not alter the reliability of Dr. Del Valle's opinion, as Dr. Del Valle used plaintiff' income to calculate lost earnings.

Defendants observe that plaintiff grew up in Puerto Rico, attended school through high school in Puerto Rico, and went to college in Puerto Rico. Id. at pp. 176-180. They note that plaintiff's first work experiences were in Puerto Rico; he maintains ties to Puerto Rico; visits Puerto Rico; and despite being a domiciliary of Texas,[16] has also resided in Puerto Rico. Id. They point out that plaintiff married three times in Puerto Rico; his former wives are from Puerto Rico, and his children were born and raised in Puerto Rico. Id. They reason that considering his links to Puerto Rico, plaintiff has more in common with other individuals in Puerto Rico's culture than with other demographic groups for purposes of survivability and labor force participation estimates. Id.

The dispute raises a legal issue with policy implications that reach beyond the specific case at hand. But the court has found no controlling precedent or authority in Puerto Rico on this matter to allow it to predict its course. In calculating damages, it is assumed that if the injured party had not been disabled, he would have continued to work, and to generate income at periodic intervals until retirement, disability, or death. See, Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 533 (1983)(so noting). An award for impaired earning capacity is intended to compensate the claimant for the diminution in that stream of income. Id. The lost stream's length cannot be known with certainty, as the claimant could have passed away at any time, and the probability that he would still be working at a given date may be constantly diminishing. Id. The uncertainty may be dealt with by considering the probability that some events could occur in the future. Those events include the probability that the claimant will be alive, that he will be participating in the labor force, and that he

---

[16] There was testimony that he lived in a truck and stayed in a hotel during weekends (Transcript at pp. 82-83, 142, 149-150).

will be actually employed, to define the expected work-life corresponding to the diminution in the stream of income that the award may compensate him for.[17]

The Puerto Rico Supreme Court has relied on Federal Department of Labor tables to measure expected work-life – see, Pérez-Cruz v. Hosp. La Concepción, 115 D.P.R. 721, 739 (1984) – while also taken into account Puerto Rico Health Department tables for life expectancy and Federal social security tables for work-life projections. See, Ponce Asphalt, 113 D.P.R. at 44. Similarly, it has been consistent in stating that expected work-life is a function of age, sex, occupation, health, origin, habits, idiosyncrasy and other intangible factors. See, Suro, 111 D.P.R. at 461 (so recognizing); Escobar-Galarza, 114 D.P.R. at 151 (citing Suro).

At some level, the Puerto Rico cohort (that is, Puerto Rico data included in tables on relevant events) may be consistent with this formulation, which mentions specific factors such as origin and idiosyncrasy, while leaving room for the application of unidentified elements that may be relevant in some cases but not others. Yet this may not be necessarily so, considering the lack of a more or less precise meaning to be applied to the terms "idiosyncrasy" and "intangible factors." Along the same line, so far as this court has been able to ascertain, the Puerto Rico Supreme Court has not been presented with the opportunity to expressly evaluate the interplay between (i) out-of-Puerto Rico domicile, work and earnings; and (ii) the nature and length of an individual's personal links to Puerto Rico for purposes of estimating work-life in the context of future lost earning calculations as a substantive matter under Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5141.[18] And so, all things considered, the following two questions encompassing these evaluative

---

[17] The labor force includes both the employed and the unemployed, but it does not include those who have no job and are not looking for one. See, Mark S. Guralmick, *Formulas for Calculating Damages*, 158 (ABA 2012)(discussing concept in context of work-life expectancy projections).

[18] At the close of the Motion/Daubert hearing, the court asked the parties to inform whether there are cases dealing with use of a

concerns should be certified to the Puerto Rico Supreme Court:

1. Whether a Puerto Rico cohort may be used to estimate the future lost earnings under Article 1802 of the Puerto Rico Civil Code, of a person born in Puerto Rico who at the time of the incident for which damages are sought was a domiciliary of a state of the United States and generated earnings in that state rather than Puerto Rico?

2. In case a Puerto Rico cohort may be used, under what circumstances would such a cohort be valid, that is, what type of links between a claimant and Puerto Rico should the court examine to ensure that the cohort is correctly applied as a matter of law?

These questions involve issues of Puerto Rico law, have important policy implications,[19] and are outcome determinative. A separate Certification Order will be entered in line with Rule 25 of the Puerto Rico Supreme Court's Regulation, P.R. Laws Ann. tit. 4 Ap. XXI-B, R 25.[20]

---

Puerto Rico cohort to calculate loss of earnings of an out-of-Puerto Rico resident (Transcript at pp. 197-201). Plaintiff informed that after a lengthy review and research, he found no such cases (Docket No. 312 at pp 1-2). Defendants did not inform the court of their findings, if any.

[19] Migration to and from Puerto Rico to the United States is well known. Puerto Ricans were living on the United States mainland in the 1830's. See, "Puerto Ricans in the Continental United States: An Uncertain Future," U.S. Commission on Civil Rights (1976), p. 19. The movement of Puerto Ricans to the United States accelerated after 1898, but large-scale Puerto Rican migration to the United States is a post-World War II phenomenon. Id. It totaled 700,000 persons between 1947 and 1973. See, Rita Maldonado, "Why Puerto Ricans Migrated to the United States in 1947-73," Monthly Labor Report, U.S. Dept. of Labor (Sept. 1976), p. 1. By 1975, there were 1.7 million Puerto Ricans residing in the United States. See, "Puerto Ricans in the Continental United States: An Uncertain Future, supra at p. 19. According to the 2008 American Community Survey, the Puerto Rican population in the United States had increased to 4.2 million, surpassing the 3.8 million in Puerto Rico. See, Sonia G. Collazo, Camille L. Ryan, Kurt J. Baunman, "Profile of the Puerto Rican Population in the United States and Puerto Rico: 2008 U.S. Census Bureau, Housing and Household Economics Statistics Division, p. 1. A number of Puerto Ricans who have lived in the United States have returned to Puerto Rico. See, Clarence Senior and Donald O. Watkins," Towards a Balance Sheet of Puerto Rican Migration," United States-Puerto Rico Commission on the Status of Puerto Rico, Special Study (1966), p. 721. At the same time, net migration seems to have been negative with respect to Puerto Rico. By some estimates, in 2015 there were 5,372,759 Puerto Ricans living in the United States and 3,547,747 in Puerto Rico. See,ttps://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_1YR/S0201//popgroup~402 attached herein as "Attachment A" and https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_5YR/S0701PR/0400000US72 attached herein as "Attachment B" as required by the Judicial Conference of the United States as approved in the March 2009 session for "all internet materials cited in final opinions be considered for preservation…" The site's pages were downloaded and filed as an attachment to this Opinion and Order in the court's Case Management/Electronic Case Files ("CM/ECF") system.

[20] As noted earlier, plaintiff seeks to exclude documents evidencing his residence at relevant time periods and/or where he claimed to be a resident of. Puerto Rico (Docket No. 266 at p. 13). He claims the issue of residence is closed by the First Circuit's conclusion that he was a domiciliary of Texas. Regardless of what his domicile was when he suffered the accident or initiated the present action, however, evidence of residence and other links to Puerto Rico would be relevant to evaluate reliance on the Puerto Rico cohort depending on the answers given to the questions to be certified to the Puerto Rico Supreme Court.

## II.     CONCLUSION

In view of the foregoing, plaintiff's motion at Docket No. 266 is GRANTED IN PART AND DENIED IN PART.   The motion at Docket No. 267 is DENIED WITHOUT PREJUDICE to plaintiff's renewing it following the Puerto Rico Supreme Court's response to the CERTIFICATION request to be made by the court by way of a separate Order.

**SO ORDERED.**

In San Juan, Puerto Rico, this 17th day of July, 2017.

<u>s/Pedro A. Delgado-Hernández</u>
PEDRO. A. DELGADO-HERNANDEZ
UNITED STATES DISTRICT JUDGE