## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JOSE APONTE-DAVILA,<br><br>**Plaintiff,**<br><br>v.<br><br>MUNICIPALITY OF CAGUAS, <u>et al.</u>,<br><br>**Defendant**. | **CIVIL NO. 13-1367 (PAD)** |

### CERTIFICATION

Delgado-Hernández, District Judge.

Plaintiff alleges to have suffered damages as a result of defendants' negligence, when he fell while walking on a public sidewalk in Caguas, Puerto Rico, as he went by a dumpster that was obstructing the sidewalk, which was highly slippery and dangerous due to accumulated grease that seeped from the dumpster into it (Docket No. 1 at p. 4).[1] He seeks compensation for, among other things, lost earnings a component of damages recognized in Puerto Rico. <u>Id.</u>[2] He retained an expert witness to support his claim, and in turn, defendants retained Dr. Jesús Del Valle, an economist, to counter the opinion of plaintiff's expert.[3]

Plaintiff challenges Dr. Del Valle opinion on a number of items,[4] but as relevant here, complains that Dr. Del Valle used Puerto Rico data ("cohort") regarding probability of survival and

---

[1] As such, the action is subject to Puerto Rico law. <u>See</u>, <u>De Jesús Adorno</u> v. <u>Browning Ferris</u>, 160 F.3d 839, 840, 842 (1st Cir. 1998)(applying Puerto Rico law to action for injuries sustained by plaintiff while attempting to deposit bag into a trash container located in Puerto Rico).

[2] <u>See</u>, Herminio M. Brau, *Los Daños y Perjuicios Extracontractuales en Puerto Rico* 474-516 (1986)(discussing concept under Puerto Rico law).

[3] The experts used different methodologies. The methodology used by plaintiff's expert is not at issue here.

[4] <u>See</u>, Opinion and Order at Docket No. 320 at pp. 10-24(examining plaintiff's objections to Dr. Del Valle's opinion). A copy of the Opinion and Order is included in the Appendix.

of participation in the labor force at various points in the future to calculate expected work-life in connection with projected future lost earnings.[5] He contends that reliance on the Puerto Rico cohort is improper because at the time of the accident he was a domiciliary of Texas, and is claiming for lost Texas earnings. Defendants counter that plaintiff was born and raised in Puerto Rico, has significant links to Puerto Rico and in that sense, has more in common with Puerto Rico to permit use of the cohort in question.

The dispute raises a legal issue with policy implications that reach beyond the specific case at hand. But the court has found no controlling precedent or authority in Puerto Rico to allow it to predict its course.[6] Accordingly, pursuant to Rule 25 of the Puerto Rico Supreme Court's Regulation, P.R. Laws Ann. tit. 4 Ap. XXI-B, R. 25, it certifies the following two questions to the Puerto Rico Supreme Court:

1. Whether a Puerto Rico cohort may be used to estimate the future lost earnings under Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5141, of a person born in Puerto Rico who at the time of the incident for which damages are sought was a domiciliary of a state of the United States and generated earnings in the United States rather than Puerto Rico?

2. In case a Puerto Rico cohort may be used, under what circumstances would such a cohort be valid, that is, what type of links between a claimant and Puerto Rico should the court examine to ensure that the cohort is correctly applied as a matter of law?

---

[5] In general, the term "cohort" refers to a group comprised by individuals sharing specified characteristics. It has been defined as "an aggregate of individual elements, each of which experienced a significant event in its life history during the same chronological interval," *International Encyclopedia of the Social Sciences* (1968); "a group of persons with a common statistical characteristic," *The Oxford Encyclopedic English Dictionary* (1991); and "a subgroup sharing a common factor in a statistical survey, as age or income level," *Webster's New World Dictionary of American English, Third College Ed.* (1988).

[6] The court asked the parties to inform whether there are cases dealing with use of a Puerto Rico cohort to calculate loss of earnings of an out-of-Puerto Rico resident (Opinion and Order at p. 24, n.18). Plaintiff informed that after a lengthy review and research, he found no such cases (Docket No. 312 at pp 1-2). Defendants have not informed the court of their findings, if any.

## I.    LEGAL FRAMEWORK

The lost earnings component of damages is commonly referred to in Spanish as "lucro cesante." See, Ronald Martínez-Cuevas, "Assessing Economic Damages in Personal Injury and Wrongful Death Litigation: the Commonwealth of Puerto Rico," 16(3) *Journal of Forensic Economics* (2003), 329 at p. 331 (so noting). It measures the earnings that the plaintiff could have been expected to receive. Id. In that regard, it basically consists of two elements: past loss ("lucro cesante pretérito") and estimated future loss ("lucro cesante futuro"). See, Rodríguez-Báez v. Nationwide Insurance Company, 156 D.P.R. 614, 619 (2002)(recognizing both elements); Velázquez v. Ponce Cement, 98 D.P.R. 201, 217-218 (1969)(same).

Recovery is allowed for both types of loss because the losses are sustained during different periods of time, and thus, do not amount to double recovery. To evaluate future lost earnings, the Puerto Rico Supreme Court has generally considered the claimant's or victim's income previous to the alleged damage; an estimation of work-life expectancy based on, among other elements, age, sex, origin, occupation, health, habits, idiosyncrasies and other intangibles; and adjustment to present value. See, Suro v. E.L.A., 111 D.P.R. 456, 461, 466 (1981); Escobar-Galarza v. Banuchi-Pons, 114 D.P.R. 138, 152-153 (1983)(Rebollo, J., Concurring Opinion).

## II.    EXPERT'S EVALUATION

Plaintiff has been described as an independent truck driver (Docket No. 167-6 at p. 3). On that end, Dr. Del Valle took into account plaintiff's net earnings; the intertemporal probability of survival, the probability of being employed, and the probability of participating in the labor force for males of the relevant age group in Puerto Rico, relying on data published by the Puerto Rico Health and Labor and Human Resources Departments. He did not apply interest to past loss, and adjusted

estimated future loss to present value.[7]

As relevant, plaintiff claims Dr. Del Valle erred in including him in the Puerto Rico cohort to rely on Puerto Rico survival and labor participation rates to estimate work-life and project future lost income (Opinion and Order at p. 21).[8] He asserts he was a domiciliary of Texas, earning income in Texas as an interstate trucker,[9] an occupation that does not exist in Puerto Rico. Id. at pp. 170-171.[10] And he maintains there is no authority for using the Puerto Rico cohort to measure loss of Texas income for a Texas domiciliary that does not work in Puerto Rico. Id. at p. 185.

Defendants observe that plaintiff grew up in Puerto Rico, attended school through high school in Puerto Rico, and went to college in Puerto Rico. Id. at pp. 176-180. They note that plaintiff's first work experiences were in Puerto Rico, he maintains ties to Puerto Rico, visits Puerto Rico every year, and despite being a domiciliary of Texas, in the meantime has also resided in Puerto Rico. Id. They point out that plaintiff married three times in Puerto Rico, his former wives are from Puerto Rico, and his children were born and raised in Puerto Rico. Id. They reason that considering his links to Puerto Rico, plaintiff has more in common with other individuals in Puerto Rico's culture

---

[7] At first glance, the calculations seem to reflect the analysis that the Puerto Rico Supreme Court has used to evaluate lost earnings. See, e.g., Suro, 111 D.P.R. at 456, 461, 466 (lost earnings calculations); Nationwide, 156 D.P.R. at 628-629 (utilizing net rather than gross earnings to calculate economic loss in case of individual -an insurance agent- with no fixed earnings); Antonio J. Amadeo-Murga, *El Valor de los Daños en la Responsabilidad Civil*, 136 (2012 ed.)(pointing out need to deduct from gross earnings the expenses necessary to generate them in order to calculate the lost earnings of self-employed individual); Brau, supra at pp. 514-516 (discussing various lost earnings scenarios). Dr. Del Valle's Report is included in the Appendix.

[8] He also unsuccessfully challenged Dr. Del Valle's report and opinion on other grounds. See, Opinion and Order (Docket No. 320) at pp. 15-23.

[9] There was testimony that he lived in a truck and stayed in a hotel during weekends (Opinion and Order at p. 22, n.16).

[10] That plaintiff's occupation – long haul trucker – does not exist in Puerto Rico or generated income in a stateside economy with higher wage rates than Puerto Rico does not alter the reliability of Dr. Del Valle's opinion, as Dr. Del Valle used plaintiff'income to calculate lost earnings.

than with other demographic groups for purposes of survivability and labor-force participation estimates. Id.[11]

### III.   ANALYSIS

Would a Puerto Rico cohort be legitimate to estimate future work-life in connection with lost earning calculations as a matter of Puerto Rico law in these circumstances? This court has found no controlling precedent in Puerto Rico on this matter. In calculating damages, it is assumed that if the injured party had not been disabled, he would have continued to work, and to generate income at periodic intervals until retirement, disability, or death. See, Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 533 (1983)(so noting). An award for impaired earning capacity is intended to compensate the claimant for the diminution in that stream of income. Id. The lost stream's length cannot be known with certainty, as the claimant could have passed away at any time, and the probability that he would still be working at a given date may be constantly diminishing. Id. The uncertainty may be dealt with by considering the probability that some events could occur in the future. Those events include the probability that the claimant will be alive, active in the labor market and employed, to define the expected work-life corresponding to the diminution in the stream of income that the award may compensate him for.[12]

The Puerto Rico Supreme Court has relied on Federal Department of Labor tables to measure expected work-life – see, Pérez-Cruz v. Hosp. La Concepción, 115 D.P.R. 721, 739 (1984) – while

---

[11] Earlier in the case, this court dismissed the complaint, concluding that plaintiff was a citizen of Puerto Rico as of the date that he initiated the action. See, Aponte-Dávila v. Municipality of Caguas, 2015 WL 3889963, *1 (D.P.R. June 23, 2015)(Docket No. 221). The First Circuit reversed, concluding that plaintiff was a citizen of Texas. See, Aponte-Dávila v. Municipality of Caguas, 828 F.3d 40 (1st Cir. 2016)(Docket No. 226). Both opinions describe plaintiff's links to Puerto Rico. See, 828 F.3d at 42-45; 2015 WL 3889963 at **1-4. Copy of the opinions are included in the Appendix.

[12] The labor force includes both the employed and the unemployed, but it does not include those who have no job and are not looking for one. See, Mark S. Guralmick, Formulas for Calculating Damages, 158 (ABA 2012)(discussing concept in context of work-life expectancy projections).

also taken into account Puerto Rico Health Department tables for life expectancy and Federal social security tables for work-life projections. See, Ponce Asphalt, 113 D.P.R. at 44. And it has been consistent in stating that expected work-life is a function of age, sex, occupation, health, origin, habits, idiosyncrasy and other intangible factors. See, Suro, 111 D.P.R. at 461 (so recognizing); Escobar-Galarza, 114 D.P.R. at 151 (citing Suro). At some level, the Puerto Rico cohort (that is, the Puerto Rico data included in tables on relevant events) may be consistent with this formulation, which mentions specific factors such as origin and idiosyncrasy, while leaving room for the application of unidentified elements that may be relevant in some cases but not in others. Yet this may not be necessarily so, considering the lack of a more or less precise meaning to be accorded to the terms "idiosyncrasy" and "intangible factors" in this context.

Along the same line, so far as this court has been able to ascertain, the Puerto Rico Supreme Court has not been presented with the opportunity to expressly evaluate the interplay between (i) out-of-Puerto Rico domicile, work and earnings; and (ii) the nature and length of an individual's personal links to Puerto Rico for purposes of estimating work-life in the context of future lost earning calculations as a substantive matter under Article 1802 of the Puerto Rico Civil Code, supra. Thus, certification is appropriate on the questions identified above to define the substantive validity of using the Puerto Rico cohort. The questions involve issues of Puerto Rico law, have important policy implications, and are outcome determinative.[13]

---

[13] Migration to and from Puerto Rico to the United States is well known. Puerto Ricans were living on the United States mainland in the 1830's. See, "Puerto Ricans in the Continental United States: An Uncertain Future," U.S. Commission on Civil Rights (1976), p. 19. The movement of Puerto Ricans to the United States accelerated after 1898, but large-scale Puerto Rican migration to the United States is a post-World War II phenomenon. Id. It totaled 700,000 persons between 1947 and 1973. See, Rita Maldonado, "Why Puerto Ricans Migrated to the United States in 1947-73," Monthly Labor Report, U.S. Dept. of Labor (Sept. 1976), p. 1. By 1975, there were 1.7 million Puerto Ricans residing in the United States. See, "Puerto Ricans in the Continental United States: An Uncertain Future, supra at p. 19. According to the 2008 American Community Survey, the Puerto Rican population in the United States had increased to 4.2 million, surpassing the 3.8 million in Puerto Rico. See, Sonia G. Collazo, Camille L. Ryan, Kurt J. Baunman, "Profile of the Puerto Rican Population in the United States and Puerto Rico: 2008 U.S. Census Bureau, Housing and Household Economics Statistics Division, p. 1. A number of Puerto Ricans who have lived in the United States have returned to

If the Puerto Rico Supreme Court were to conclude the Puerto Rico cohort may not be used as a matter of law, and even if it could be used, the circumstances under which use of such a cohort would be valid do not exist here, Dr. Del Valle's opinion on plaintiff's future lost earnings would lack validity. The court welcomes any observations about Puerto Rico law that the Puerto Rico Supreme Court may wish to offer.

### IV. CONCLUSION

In compliance with P.R. Laws Ann. tit. 4 Ap. XXI-B, R. 25, an Appendix is included with certified copy of (i) the Complaint (Docket No. 1); (ii) this court's Opinion and Order dismissing the case for lack of complete diversity between the parties (Docket No. 221); (iii) the First Circuit's decision on the same issue (Docket No. 226); (iv) the Report of Dr. Jaime del Valle (Docket No. 267-2); and (v) the Opinion and Order setting forth and examining the discovery-related controversies out of which the certified questions emerged (Docket No. 320). The Clerk of the Court shall transmit this Certification to the Clerk of the Puerto Rico Supreme Court pursuant to P.R. Laws Ann. tit. 4 Ap. XXI-B, R. 25.[14]

**SO ORDERED.**

In San Juan, Puerto Rico, this 17th day of July, 2017.

s/Pedro A. Delgado-Hernández
PEDRO. A. DELGADO-HERNANDEZ
UNITED STATES DISTRICT JUDGE

---

Puerto Rico. See, Clarence Senior and Donald O. Watkins," Towards a Balance Sheet of Puerto Rican Migration," United States-Puerto Rico Commission on the Status of Puerto Rico, Special Study (1966), p. 721. At the same time, net migration seems to have been negative with respect to Puerto Rico. By some estimates, in 2015 there were 5,372,759 Puerto Ricans living in the United States and 3,547,747 in Puerto Rico. See, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_1YR/S0201//popgroup~402 attached herein as "Attachment A" and https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_5YR/S0701PR/0400000US72 attached herein as "Attachment B" as required by the Judicial Conference of the United States as approved in the March 2009 session for "all internet materials cited in final opinions be considered for preservation…" The site's pages were downloaded and filed as an attachment to the Certification in the court's Case Management/Electronic Case Files ("CM/ECF") system.

[14] A copy of the entire Docket – as it appears in the CM/ECF system – is also be included in the Appendix, to facilitate review of relevant materials.